FIRST DIVISION
September 27, 2010

No. 1-09-1099

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 4366 |
| | ) | |
| SAMUEL PRIMBAS, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE PATTI delivered the opinion of the court:

Following a bench trial, defendant Samuel Primbas was convicted of aggravated cruelty to a companion animal and was sentenced to two years of felony probation.  On appeal, defendant argues that the State was required, but failed, to prove beyond a reasonable doubt that he intended to cause the death of the companion animal.  We affirm.

Georgia Bouziotis testified that defendant and his mother, Jeanette Primbas, are her distant relatives whom she has known her entire life.  On the morning of November 17, 2007, Georgia took her nine-year-old pet dog, Shelby, for a walk.  Shelby was a black and tan 85-pound female Rottweiler that wore a fluorescent orange collar.  It was cloudy that morning but not raining.  Georgia and Shelby stopped at Jeanette Primbas's house and Georgia entered the house after tying Shelby's leash to a deck post.  A few minutes later, Georgia heard footsteps on the deck

and then "stomping" on the deck. She went outside and saw defendant at the bottom of the deck steps. She turned and saw Shelby lying on her side. Shelby was wearing her fluorescent orange collar. Defendant asked her, "Georgia, is that your dog?" She said that it was. Defendant told her he thought Shelby was having a seizure and demonstrated by jumping back and forth on each foot. Georgia examined Shelby and knew she was not having a seizure. Then Georgia found a hole on Shelby's left side near her hip. Within minutes Shelby died.

Georgia told defendant she thought Shelby had been shot. Defendant replied that "it could have been the guy across the street." Then he told her it could have been the McGrath twins, who carry a pellet gun. The police came and prepared a report. Other people came and confirmed Shelby had been shot. Later that morning, Shelby was buried in Jeanette's yard.

That evening, defendant phoned Georgia and told her he was sorry he had shot her dog. He said he thought Shelby was a stray eating garbage on his mother's porch. He said, "I didn't mean to kill her. I didn't shoot her in the head." "I shot her from the service door in the garage." He said he shot Shelby with a pellet gun. He sounded upset and said he would get her another dog. She told him she did not want another dog.

Defendant had seen Shelby "on several occasions" and had been to Georgia's home previously. One such occasion was on

September 29, 2007, when Georgia gave a party.  Shelby was in the backyard when defendant went out to the yard before the party began.  Georgia had also seen defendant several times in previous months when she walked with Shelby past Jeanette's home.

Gregory Bouziotis, Georgia's brother, testified he arrived at Jeanette's house shortly after Shelby died.  Shelby was wearing an orange collar and a blue and orange leash.  Gregory asked defendant what happened and defendant said he did not know.  A couple of hours later, Gregory phoned defendant and again asked him what happened.  He repeated he did not know.  Gregory phoned defendant again and defendant admitted he shot the dog, that he did not know whose dog it was, and that it was an accident.  Previously, Gregory had seen defendant's pellet gun on the garage workbench.  The gun was about 2½ or 3 feet long and had a scope on it.

Shelby was later removed from the grave on Jeanette's property.  The parties stipulated that on December 12, 2007, Dr. Frederickson performed a necropsy on Shelby's remains.  He observed hemorrhaging and accumulated blood in the dog's chest cavity and a pellet in tissue surrounding the right kidney, confirming gunshot trauma.  In his opinion, death was due to a pellet that was shot through the thorax and may have damaged a vessel extending off the aorta, leading to the hemorrhage.

For the defense, Jeanette Primbas testified she lives alone and defendant, her son, lives nearby.  Defendant comes to Jeanette's home every day and keeps his tools in her garage, which he uses to work on cars.  He also kept a pellet gun there.  The house sits on three lots and the property is "all wetland" and "like a farm area."  Over the years she has kept horses, goats, turkeys, and lambs on the property.  She has had animals killed by wild dogs and coyotes.  There is a garbage can on the deck, and stray animals remove the lid and dig for food.  Occasionally Jeanette would see Georgia walking her dog, but Jeanette's deck was 600 or 700 feet away, too far to enable her to recognize the dog.  Jeanette attended the party at Georgia's house on September 29, 2007, and was in the backyard with 10 or 15 other guests.  Defendant came to the backyard, deposited beverages, and left.  There was no dog in the yard that day.

At about 8:30 on the morning of November 17, 2007, it was raining heavily.  Georgia rang the doorbell and came in for about 45 minutes.  Before that day, Georgia had not been to the house in a year.  After the rain subsided, Jeanette walked Georgia to the door and they found Georgia's dog jumping around on the deck, "like in a seizure form."  Then the dog stopped jumping, lay down, and died.  Jeanette did not see a collar or leash.  Defendant was not present at that time.  Georgia called her brother, Greg, and he came over.  Georgia walked to the street

and flagged down a police officer.  Then defendant came on the scene.  Later in the day, Jeanette phoned defendant to find out what had happened to Shelby.  He told her he thought the dog was a stray and he accidentally shooed it away with a pellet.

Defendant testified that his mother's house is in the middle of swampland and prairie, full of wildlife.  Two and a half years earlier, a stray Rottweiler came onto his mother's property and killed her two goats.  A coyote killed her sheep and poultry.  Early on the morning of the incident, defendant was working on a car in his mother's garage.  The garage service door is about 15 or 20 feet from the deck of the house.  Defendant heard "some scrambling" on the porch and thought it was a coyote in the garbage.  He saw a large dark-colored animal with its head in the garbage can.  Defendant testified, "I didn't get close enough to find out what it was."  He grabbed his kids' pellet gun.  From the service door, he fired through the slats of the deck, aiming at the animal's rear end.  He heard a yelp, then went back into the garage.  He thought the animal ran off.  He did not know it was someone's pet.  It was raining, and he did not see a collar on the animal.  He wanted only to shoo it away, not kill it.

Later, defendant saw his mother and Georgia on the porch. He came over, saw the dog lying on the porch, and realized he had made a mistake.  He said nothing at that time because he was ashamed and embarrassed.  After he buried the dog, he went to a

pet store that afternoon to buy Georgia a new dog because he felt bad and was ashamed and had made a mistake.  Before that day, the last time he had seen Georgia's dog it was a puppy.

At the conclusion of the trial, the court found the evidence established that defendant intended the consequences of his act in shooting the companion animal Shelby.  In reaching its decision, the court found that Georgia Bouziotis was a credible witness and that the testimony of defendant and his mother was not credible.

On appeal, defendant first contends the trial court erred in failing to recognize that the pertinent statute, section 3.02 of the Humane Care for Animals Act (510 ILCS 70/3.02 (West 2006)), requires the State to prove not only that defendant intentionally committed an act resulting in the death of a companion animal, but that he also intended to seriously injure or kill the animal. Defendant concedes he failed to preserve this issue for review, but we shall address it, as the question of the State's burden of proof affects an accused's substantial rights and threatens the integrity of the judicial process.  People v. Laugharn, 297 Ill. App. 3d 807, 810-11 (1998).

Questions of statutory interpretation are questions of law subject to *de novo* review.  People v. Christopherson, 231 Ill. 2d 449, 454 (2008).  The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature.

In re Madison H., 215 Ill. 2d 364, 372 (2005).  The best indicator of the legislature's intent is the language in the statute, which must be accorded its plain and ordinary meaning. Christopherson, 231 Ill. 2d at 454-55.

The relevant portion of section 3.02 states:  "No person may intentionally commit an act that causes a companion animal to suffer serious injury or death."  510 ILCS 70/3.02 (West 2006). After the State and defense rested, the trial court and parties addressed the meaning of the statute.  The State construed section 3.02 to require evidence only that defendant intentionally committed the act resulting in a companion animal's serious injury or death, not that defendant intended the serious injury or death.  The trial court paraphrased the State's position and then stated, "I read that statute to mean that you intend the act that causes the harm."  Defendant asserts this statement indicates the trial court erroneously concluded the State was not required to prove defendant intended to kill Shelby and, consequently, that the court's erroneous interpretation of the statute deprived him of a fair trial.

In support of his contention that the statute requires that the State prove he intended to kill or seriously injure a companion animal, defendant relies on People v. Larson, 379 Ill. App. 3d 642 (2008).  In Larson, we ruled that "the scope of punishable conduct is limited by the individual's specified

intent to cause the companion animal to suffer serious injury or death." Larson, 379 Ill. App. 3d at 651. The State contends that Larson is inapposite because the issue there dealt with forms of euthanasia under another paragraph of the statute. We find Larson instructive, however, in interpreting the conduct proscribed by the statute. We observed in Larson that the evil the statute is intended to prevent is the intentional killing or injuring of companion animals and that application of this ordinary and popular meaning of the statutory language provides adequate notice of the conduct the statute prohibits. Larson, 379 Ill. App. 3d at 652.

In furtherance of his argument that the State is required to prove specific intent, defendant advances a hypothetical example of what he suggests is an unreasonable result of interpreting the statute as a general intent crime, namely, criminalizing the act of one hunter who aims his gun at a quail and pulls the trigger but shoots another hunter's dog. We find this to be a compelling argument and, together with our interpretation of the provision in Larson, agree with defendant that the statute requires the State to prove beyond a reasonable doubt not only that defendant caused the death of Shelby but that he also did so with the specific intent to cause Shelby to suffer serious injury or death.

1-09-1099

We reject defendant's contention, however, that the trial court misapprehended the State's burden of proof under section 3.02. It is well settled that we review the judgment of the trial court, not its reasoning, to determine whether the court reached the proper result. People v. Rajagopal, 381 Ill. App. 3d 326, 329 (2008). It is also axiomatic that, unless the record demonstrates otherwise, we must presume that a trial judge knows and follows the law . People v. Jordan, 218 Ill. 2d 255, 269 (2006). Notwithstanding the trial court's comments during argument, the record discloses that after hearing the arguments of both parties, the court went on to examine each element of the statute and to find that the State had sustained its burden of proving all elements of the offense, including a specific intent to kill or harm a companion animal.

Consequently, we address defendant's second contention on appeal, that the evidence failed to prove he intentionally caused an animal known to be a companion animal to suffer serious injury or death.

When a court reviews a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Jackson, 232 Ill. 2d 246, 280 (2009). This standard of review does not allow a

reviewing court to substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. Jackson, 232 Ill. 2d at 280-81. It is the trial court's right and obligation to determine the weight and credibility to be given the witnesses' testimony, resolve any inconsistencies and conflicts in the evidence, and decide the reasonable inferences to be drawn from the testimony. People v. Bannister, 378 Ill. App. 3d 19, 39 (2007). When a defendant testifies, the fact finder is not required to believe his testimony. Larson, 379 Ill. App. 3d at 655.

There can be no doubt the evidence was sufficient to support the court's finding that defendant committed the act which resulted in Shelby's death, as defendant admitted at trial to shooting Shelby. Moreover, the trial court's thorough review of the evidence at the close of the trial indicated it believed both that defendant knew the animal he was shooting at was Georgia's pet Shelby and that there was a culpable mental state associated with the cause of Shelby's death. The court reached that factual conclusion upon finding Georgia credible and finding defendant and his mother not credible.

The court specifically rejected defendant's claim that his intent was only to drive away what he thought was a wild animal, not to cause injury or death to the animal. Where a defendant denies intent, as here where defendant claimed he had no intent

to harm Shelby, intent may be demonstrated through circumstantial evidence. <u>People v. Phillips</u>, 392 Ill. App. 3d 243, 259 (2009). Defendant testified he fired the pellet gun merely to shoo away what he believed was a feral animal and claimed he thought the animal had run away. In finding this testimony unbelievable, the trial court noted defendant also testified he immediately walked back into the garage after firing the shot, without ascertaining whether the animal had been scared off or lay wounded on the deck, where it could have posed a danger to his mother.

The court also found the State's evidence credible on the issue of whether defendant knew the animal was Georgia's pet dog Shelby. After hearing conflicting testimony as to whether it was raining at the time of the incident so as to obscure defendant's view of the animal, whether defendant was familiar with Shelby's appearance, and whether Shelby wore a distinctive fluorescent collar and a leash on that day, the court found: "There is no question in my mind about the credibility of Georgia Bouziotis. She has absolutely no motivation to make stuff up regarding these folks whom she is related to." On the other hand, the court found defendant's testimony to be "the most absurd testimony I have heard in my life. It's utterly unbelievable." The court evaluated the credibility of the testimony of defendant's mother as "pathetic."

We conclude the evidence established beyond a reasonable doubt that defendant committed an act resulting in serious injury or death to a companion animal and that defendant intended to cause the companion animal to suffer serious injury or death.

For all of the above reasons, we affirm the judgment of the trial court.

Affirmed.

HALL, P.J., and GARCIA, J., concur.